**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH MILLER,** | : | |
| | : | **2:13-CV-00124 (Miller)** |
| **Plaintiff,** | : | **2:13-CV-00125 (Crozier)** |
| | : | **2:13-CV-00126 (Coleman)** |
| **v.** | : | **2:13-CV-00127 (Gibbs)** |
| | : | **2:13-CV-00129 (Johnson)** |
| **FOOD CONCEPTS INTERNATIONAL,** | : | **2:13-CV-00130 (Troyer)** |
| **LP, et al,** | : | **2:13-CV-00132 (Tigner)** |
| | : | **2:13-CV-00133 (McEldowney)** |
| **Defendants.** | : | **2:13-CV-00134 (Keegan)** |
| | : | |
| | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| | : | **Magistrate Judge Deavers** |
| | : | |

**OPINION & ORDER**

In 2013, Plaintiffs Joseph Miller (2:13-cv-00124), Teddy Crozier (2:13-CV-00125), Komekeo Coleman (2:13-CV-00126), Eric Gibbs (2:13-CV-00127), Stacie Johnson (2:13-CV-00129), Lucas Troyer (2:13-CV-00130), Angie Tigner (13-CV-132), Amanda McEldowney (2:13-CV-00133), and Jamie Keegan (2:13-CV-00134) (collectively, "Plaintiffs") sued Food Concepts International, LP ("Food Concepts"), Abuelo's International LP ("Abuelo's"), Mark Myers, and Darren DelVecchio (collectively, "Defendants").  Currently before the Court are: (1) Defendants' Motions for Summary Judgment; (2) Defendants' Motion to Strike Affidavits Filed with Plaintiffs' Memoranda in Opposition to Defendants' Motions for Summary Judgment; and (3) Plaintiffs' Motion to Strike Defendants' Reply in Support of their Motion to Strike Plaintiffs' Affidavits.  For the following reasons, the Court **GRANTS in part** Defendants' motion to strike, **DENIES** Plaintiffs' motion to strike, and **GRANTS in part** Defendants' motions for summary judgment.

1

# I. BACKGROUND

These cases deal primarily with the wage and hours practices at Abuelo's Restaurant #621 at Easton Town Center, in Columbus, Ohio.[1]

## A. Factual Background

Food Concepts is the parent company for Abuelo's restaurants, which is a nationwide chain of high volume restaurants. (Miller Dep. Ex. 2.) Plaintiffs are current or former employees of Abuelo's Store #621, which is located in the Easton Town Center shopping mall in Columbus, Ohio. Plaintiffs served in various roles, including bartender, server, trainer, and shift lead. Defendant Mark Myers serves as Regional Manager for Abuelo's, and has served in that role since approximately 2003. Mark Myers supervised the General Managers of several stores, including Store #621. Defendant Darren DelVecchio served as General Manager of Store #621 from April 2010 until January 12, 2011.

Abuelo's Store #621 keeps employees' time through an Aloha point of sale system. Employees record their time at work by clocking in and out of the Aloha system. Abuelo's corporate payroll department uploads this data weekly and pays employees bi-weekly pursuant to payroll reports it generates from the uploaded data. The time spent between clocking in and clocking out is time spent "on the clock." The Aloha point of sale system does not record time spent working "off the clock," meaning time spent working before clocking in or after clocking out. For a number of years, Store #621 management encouraged employees to work off the clock to reduce labor costs and prevent employees from accruing overtime.

When a server or bartender (for ease of reference, the Court will refer to both as "servers") begins a shift, she is ostensibly supposed to clock in. Store #621's unwritten policy,

---

[1] These cases began with claims touching on many aspects of the work environment at Abuelo's store #621. The Court will not address allegations pertaining to claims that have been dismissed.

however, was for servers to wait to clock in until they received their first table.  Servers typically spent the time between arrival and clock-in doing "side work," or preparing their tables, sweeping floors, filling sugar and salt shakers, et cetera.

Once the server ends her shift, she closes all of the transaction from her sales for that shift by going through a checkout (or "cash out") process.  The server initiates the checkout process by swiping her card to activate the Aloha system, which then generates a checkout report.  The server prints the checkout report and takes it to a manager for review.  The server then reconciles the money with the manager.

A server typically clocks out after the "cash out" process.  When she clocks out, she declares her tips.  After clocking out, she may finish her side work, if she did not do so before clocking out.  She also may be drawn into running food, taking out trash, or helping other employees.

When a server clocks out, the Aloha system prints a "chit"—a paper receipt identifying the job under which the employee clocked in, the employee's clocked-in and out times, the number of hours worked during that shift, the total hours worked during that work week, total sales, tip share amount, declared tips, and charged tips.  The system does not keep an electronic copy of the chit; rather, the chit is for the employee's records.  Plaintiffs in these cases did not keep their chits.

Managers are able to adjust an employee's time if she, for example, forgets to clock in or out at the correct time or fails to declare the correct amount of tips.  This adjustment is called a "punch edit."  The company maintains a punch edit report, which shows adjustments made to time or tips.  Plaintiffs claim that Defendants made invalid punch edits to their time by, in general, reducing their hours and increasing declared tips.

When Plaintiffs were hired by Abuelo's, they received an employee handbook.  They also signed an acknowledgement of receipt of the employee handbook.  The employee handbook contains disclaimers, set forth in detail below, that state that the handbook does not form a contract of employment, and it may be changed by Defendants at any time.

Plaintiffs report that they worked off the clock and were not paid for such time—in regular, or overtime wages.  Plaintiffs also report not being afforded paid vacations or bonuses, as outlined in the employee handbook.

### B.  Procedural Background

The Court will provide only highlights of the tortured procedural background of these cases.  Plaintiffs' original complaints, filed in January 2013 in the Franklin County Court of Common Pleas, alleged various causes of action against Defendants, such as: sex discrimination; negligent hiring, supervision and retention; intentional infliction of emotional distress; violation of state and federal minimum wage and overtime laws; and wrongful termination.  (Doc. 1-1.)[2] The original complaints, albeit long, were short on facts pertaining to Plaintiffs.  Defendants removed the cases to federal court on February 12, 2013.  (Doc. 1.)

Over the next eight months, following multiple requests from Defendants, the Court issued several orders requiring Plaintiffs to file amended complaints that complied with the basic notice requirements of Federal Rule of Civil Procedure 8(a).  (Docs. 9, 16, 27, 30.)  When Plaintiffs' counsel finally filed Amended Complaints on October 15, 2013, it became clear that these Amended Complaints, too, failed to comply with the Court's orders and the federal rules.

---

[2] For ease of reference, unless otherwise indicated, docket citations refer to documents filed in the Miller case, 2:13-cv-124.  When referring to documents filed in other cases, the Court will use the relevant Plaintiff's last name (e.g., "Johnson Doc. 33").  The case numbers for each case cited may be found in this Opinion & Order's caption.

Consequently, the Court was compelled to order Plaintiffs to show cause why their lawsuits should not be dismissed. (Doc. 30.)

On October 25, 2013, Plaintiffs attached a third version of their complaints to their responses to Magistrate Judge Abel's Order to Show Cause. (Doc. 31.) With no explanation or request for leave, some Plaintiffs attached a fourth version on November 18, 2013. (*See*, *e.g.*, Doc. 33.) Depending on the Plaintiff, these complaints alleged causes of action for: (a) wage and hour violations of FLSA; (b) breach of contract; (c) retaliation under state and federal law; (d) aiding and abetting discrimination in violation of state law; (e) a hostile work environment; and/or (f) retaliation/loss of job benefits. (Doc. 36.) On January 17, 2014, Magistrate Judge Abel conducted an exhaustive review as to whether these versions could pass muster under the lenient, notice-pleading standard of Federal Rule of Civil Procedure 8(a). (Doc. 36.) Alas, large sections of them could not, and Magistrate Judge Abel recommended that Plaintiffs' retaliation and aiding and abetting claims be dismissed with prejudice, as well as the vast majority of their hostile work environment claims. (Doc. 36.) Judge Abel recommended that Plaintiffs' FLSA wage and hours, and breach of contract, and Johnson's hostile work environment claims, be allowed to proceed. (Doc. 36.) No party objected, and, on February 18, 2014, this Court adopted the Magistrate Judge's Report and Recommendation. (Doc. 38.)

The next several months were punctuated by discovery disputes, (*see*, *e.g*., Docs. 45, 50, 53, 61, 62, 79), Plaintiffs' unsuccessful motion for sanctions following a mailing mix-up, (Docs. 47, 69), and Plaintiffs' attempt to file a second amended complaint. (Doc. 60.) The Magistrate Judge denied Plaintiffs' motion for leave to file a second amended complaint on February 18, 2015. (Doc. 82.) At least one Plaintiff objected to the Magistrate Judge's order, (*see, e.g.*, Tigner Doc. 62), and this Court overruled this objection. (Tigner Doc. 66.) Plaintiffs also filed a

motion for prejudgment attachment of Defendants' assets, (Doc. 90), which, following a hearing, this Court denied for lack of valid justification.  (Doc. 119 at 5.)

Defendants filed motions for summary judgment on July 5, 2016.  (Doc. 156.)  Following three extensions of the time to file their responses, Plaintiffs filed their oppositions on August 23, 2016.  (Doc. 171.)[3]  Defendants filed their replies in support of their motions on September 23, 2016 (Doc. 177), along with a motion to strike the affidavits filed with Plaintiffs' responses. (Doc. 178.)  On November 3, 2016, Plaintiffs moved to strike Defendants' reply in support of *Defendants'* motion to strike, (Doc. 181), and Defendants responded on November 4, 2016. (Doc. 182.)  Defendants' motions for summary judgment (Doc. 156) and motion to strike (Doc. 178), and Plaintiffs' motion to strike (Doc. 181), are ripe for review.

## II.  MOTIONS TO STRIKE

Defendants seek to strike the affidavits filed with Plaintiffs' memoranda in opposition to Defendants' motions for summary judgment, because: (1) many were untimely filed; (2) they contradict the affiants' deposition testimony and contain evidence not produced in discovery; and (3) the third-party affidavits were made with no personal knowledge of the statements made therein.  (Doc. 178 at 4.)  Plaintiffs seek to strike Defendants' reply in support of their motion to strike because, they argue, Defendants untimely filed their brief.  (Doc. 181.)

---

[3] Actually, in several of the cases, Plaintiffs filed two responses: the first, by their thrice extended deadline of August 23, 2016, and the second, with no explanation or request for leave as required by Local Rule 6.1(b), on August 29, 2016.  (Docs. 171, 173.)  Because Plaintiffs' second set of responses was untimely under Local Rule 7.2(a)(2) and filed without leave under Local Rule 6.1(b), the Court will disregard it.  The Court will instead consider Plaintiffs' first, timely-filed, set of responses.

Plaintiff's counsel also timely filed McEldowney's response in Johnson's case (Johnson Doc. 100), which the Court will disregard in favor of Johnson's response.  (Johnson Doc. 99.)

### A.  Plaintiffs' Motion to Strike

Plaintiffs' motion to strike for Defendants' allegedly untimely filing is easily disposed-of and not well taken.  Defendants filed their motion to strike on September 23, 2016.  (Doc. 178.) Response and reply deadlines are governed by Local Rule 7.2(a)(2) and Federal Rule of Civil Procedure 6(d).  Local Rule 7.2(a)(2) provides twenty-one (21) days for Plaintiffs to respond to Defendants' motion.  Because Defendants' motion was filed in September 2016, Federal Rule of Civil Procedure 6(d) adds three days to that deadline because Defendants' motion was filed electronically.[4]  In accordance with these rules, Plaintiffs filed their response on October 17, 2016—twenty-four days after Defendants filed their motion.  (Doc. 179.)

Under Local Rule 7.2(a)(2) and Federal Rule of Civil Procedure 6(d), Defendants had fourteen days plus three days to file their reply brief.  Consequently, Defendants' reply brief was due on November 3, 2016.  Defendants' reply brief, which they filed on November 3, 2016, was timely.  (Doc. 180.)

For these reasons, Court **DENIES** Plaintiffs' motion to strike.  (Doc. 178.)

### B.  Defendants' Motion to Strike

With each memorandum in opposition to Defendants' motions for summary judgment, Plaintiffs filed three affidavits: one from each Plaintiff, one from former Abuelo's General Manager Miro Lucinan,[5] and one from former Abuelo's Assistant General Manager Ed Linihan. Defendants argue that this Court should strike the affidavits filed with Plaintiffs' memoranda in opposition to Defendants' motions for summary judgment, because: (1) many of Plaintiffs' affidavits were untimely filed; (2) all three affidavits contradict the affiants' deposition testimony

---

[4] Effective December 1, 2016, Federal Rule of Civil Procedure 6(d) was changed to add three days to responding parties' deadlines only if the original party filed its motion by mail, leaving with the clerk, or other means consented to.

[5] Mr. Lucinan was the subject of a former motion to disqualify Plaintiff's counsel (Doc. 100), which this Court denied in October 2015.  (Doc. 137.)

and contain evidence not produced in discovery; and (3) the third-party affidavits were executed without personal knowledge of the statements made therein. (Doc. 178 at 4.)

Amendments made to Federal Rule of Civil Procedure 56 in 2010 changed the mechanism for objecting to the affidavits filed with Plaintiffs' opposition briefs. *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011). Where, before 2010, Defendants would have filed a motion to strike, there is no longer any need for such a motion. *Id.* Instead, the Court will treat Defendants' motion to strike as an objection under Federal Rule of Civil Procedure 56(c)(2), which provides: "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Court will disregard only the inadmissible portions of the affidavits. *See Roshen v. Int'l Business, Machines Corp.*, no. 2:14-cv-260, 2016 WL 950363, at *8 (S.D. Ohio March 14, 2016).

For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike. More specifically, the Court will consider the affidavits of Plaintiffs Gibbs and Johnson, but not the affidavits or supporting documentation of Plaintiffs Miller, Crozier, Coleman, Troyer, Tigner, McEldowney (to the extent referencing time worked off the clock or unpaid overtime), or Keegan. The Court will also not consider paragraphs 3-4, 10-13, 15-16, or 20 of Lucinan's affidavit, or paragraphs 7-12, or 16-22 of Linihan's affidavit.

### 1. Timeliness of Filing (*Affidavits of Miller, Coleman, Gibbs, Johnson, Troyer, McEldowney, and Keegan*)[6]

Plaintiffs Miller, Coleman, Gibbs, Johnson, Troyer, McEldowney, and Keegan filed their affidavits on August 24, 2016, one day after their thrice-extended deadline for filing their oppositions and exhibits in connection thereto. (Docs. 160, 163, 170.) One extension had been

---

[6] Plaintiffs Crozier and Tigner timely filed their affidavits.

jointly sought by Plaintiffs and Defendants; the next two were sought by Plaintiffs alone.  (Docs. 159, 162, 169.)  Defendants seek to strike these affidavits as untimely in light of Local Rules 7.2(d) and (e), and Plaintiffs' counsel's continuing "bold disregard of deadlines" throughout this litigation.  (Doc. 178 at 6.)

Local Rules 7.2(d) and (e) provide, in relevant part:

> **(d) Evidence Supporting Motions - Deadlines**. When proof of facts not already of record is necessary to support or oppose a motion, all evidence then available shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence. … If evidence is not available to meet this schedule or circumstances exist as addressed by Fed. R. Civ. P. 56(d), counsel shall consult one another and attempt to stipulate to a joint motion for extension of the schedule established by this Rule; failing agreement, counsel shall promptly bring the matter to the attention of the Court.

> **(e) Memoranda Evidence.** …Unless already of record, such evidence [in opposition to a motion for summary judgment] shall be attached to the memorandum or included in an appendix thereto. … All evidence shall be submitted within the time limit set forth above.  Evidence submitted, including discovery documents, shall be limited to that necessary for decision and shall include only essential portions of transcripts or exhibits referenced in the memorandum.

S.D. Ohio R. Civ. P. 7.2(d) and (e).  Analogously, Federal Rule of Civil Procedure 16 "grants district courts wide latitude to impose sanctions for failure to comply with their scheduling orders."  *Estes v. King's Daughters Med. Ctr.*, 59 F. App'x 749, 752-53 (6th Cir. 2003) (affirming the district court's decision to strike untimely-filed affidavits) (citation omitted).[7]  The fact that proposed testimony is important "cannot singularly override the enforcement of local rules and scheduling orders."  *Estes*, 59 F. App'x at 754 (quotation omitted).

The affected Plaintiffs oppose the striking of their affidavits, arguing (but not supporting with affidavits or otherwise) that: (a) they had prepared their response "well in advance of the filing deadline"; (b) Plaintiff's counsel "attempted to file Plaintiffs' affidavits and exhibits well before

---

[7] Federal Rule of Civil Procedure 16(f)(1)(C) allows the Court, "[o]n motion or on its own, [to] issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney: …fails to obey a scheduling or other pretrial order."  Fed. R. Civ. P. 16(f)(1)(C).

the Court ordered deadline;" but (c) "unfortunately, the size of Plaintiffs' affidavits and exhibits exceeded the limits of the CM/ECF system."  (Doc. 179 at 2.)  Plaintiffs' counsel's definition of "well in advance of the deadline" appears to mean, as set forth more fully below, the evening his clients' filings were due.  (*Id.*)  Plaintiffs distinguish this latest untimely filing from the "prior incident cited by Defendants" by arguing that "in this instance Plaintiff [sic] were ready and willing but unable to file their affidavits and exhibits in support electronically because of CM/ECF limitations."  (*Id.*)

The Court has no means to determine whether Plaintiff's counsel's current cry of the technological version of "wolf" is justified.  The Court *is* aware, however, of Plaintiffs' continuous blatant disregard of deadlines throughout this litigation.  For example, after several attempts by Defendants and the Court to induce Plaintiffs to amend their complaints to comply with the notice requirements of Federal Rule of Civil Procedure 8(a), Plaintiffs filed, without explanation or justification, amended complaints that, again, were deficient under the federal rules.  Magistrate Judge Abel ordered Plaintiffs to show cause why they did not comply with the Court's orders and the federal rules, and summarized Plaintiff's counsel's explanation:

> In response, plaintiffs' counsel did not maintain that the amended complaints complied with the October 3 Order. Instead, he asserted that he and his co-counsel drafted amended complaints, but on October 16 he and his staff were unable to find the word processing files for them. After his IT staff failed in their attempts to locate the files, plaintiffs' counsel and his staff hurriedly attempted to replicate the draft amended complaints in the 3-5 hours they had remaining before the filing deadlines. Now Plaintiff's counsel has substantially recovered the draft amended complaints and could file them on October 21. Plaintiffs' counsel did not communicate this information to me or opposing counsel until the October 18, 2013 telephone conference.  (Doc. 30 at 3-4.)

Plaintiffs finally filed another set of amended complaints, as ordered, in their responses to Magistrate Judge Abel's order to show cause.  (Doc. 31.)  Yet, in certain cases, Plaintiffs filed *another* amended complaint weeks later, again with no explanation.  (Doc. 33.)

Plaintiffs also tried to skirt the deadline for filing expert reports by providing successive sets of amended reports to Defendants after the deadline. The Court barred the untimely reports. (Doc. 115 at 3-4.) In striking as untimely Plaintiffs' exhibits in support of their Response in Opposition to Defendants' Motion in Limine, the Court noted that this was "not the first instance in this case of Plaintiffs' counsel failing to meet deadlines and making excuses based on technological failures." (Doc. 145 at 3.)

Plaintiffs have not changed their behavior following these orders; rather, the affidavits at issue now are just the latest in a long string of untimely filings, showing Plaintiffs' counsel's disrespect for the Court's deadlines. Now as before, Plaintiffs did not explain their technological issue or otherwise seek leave to file late responses. (*Id.*)[8]

Plaintiffs' finger-pointing at Defendants for not raising the issue of Plaintiffs' untimely-filed affidavits until Defendants' replies in support of their motions for summary judgment (Doc. 179 at 3), is not well-taken. It was *Plaintiffs'* burden to justify the late filing. Having already experienced technological failures over the course of these cases, Plaintiffs' counsel was in an excellent position to learn from his past technological failures and allow extra time for filing his clients' affidavits.

In the event the Court is inclined to disregard Plaintiffs' affidavits for being untimely, Plaintiffs seek, in their response to Defendants' motion to strike, leave to file their affidavits. Plaintiffs posit that Defendants have not been prejudiced by the delay, and request that the Court find the untimely filings to be the product of excusable neglect. (Doc. 179 at 3.) Plaintiffs cite no rule or case to support their argument. (*Id.*)

---

[8] After untimely filing affidavits and exhibits, Plaintiffs filed additional untimely *oppositions* to Defendants' motions for summary judgment. (See, e.g., Doc. 173.) A comparison of the successive oppositions shows differences between the two. Because Plaintiffs' counsel did not explain the differences or the need for successive oppositions, the Court will not know whether Plaintiffs meant to amend their prior oppositions or whether the later filings were a mistake.

Despite Plaintiffs' counsel's carelessness, the Court will not strike Plaintiffs' affidavits for being untimely.  The affidavits of Plaintiffs Miller, Coleman, Gibbs, Johnson, Troyer, McEldowney, and Keegan were filed one day late.  Neither Plaintiffs nor Defendants raised the issue until Defendants' motion to strike, filed nearly a month later.  (Doc. 178.)  Defendants were not prejudiced by the short delay, and disregarding affidavits based on untimeliness does not serve the interests of justice.  Because the Court has the discretion to issue *just* orders in relation to its schedule, the Court will not disregard Plaintiffs' affidavits on the ground that they were filed one day late.  Besides, this Court will not punish Plaintiffs for the dilatoriness of their counsel where, as here, no prejudice inures to the Defendants.

### 2.  Statements Contradictory of Deposition Testimony (*All Three Affidavits*)

A nonmoving party cannot defeat a motion for summary judgment "simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Kelso v. City of Toledo*, 77 F. App'x 826, 834 (6th Cir. 2003).  This Court has previously held that "[i]f a witness, who has knowledge of a fact, is questioned during her deposition about that fact, she is required to 'bring it out at the deposition and cannot contradict her testimony in a subsequent affidavit.'"  *Bradley v. Mary Rutan Hosp. Assoc*., 322 F. Supp. 2d 926, 933 (S.D. Ohio 2004) (quotation omitted).

In deciding the admissibility of a post-deposition affidavit at the summary judgment stage, a district court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony."  *Aerel, S.R.L v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  If so, the affidavit should be stricken "unless the party opposing summary judgment provides a persuasive justification for the contradiction."  *Id.*  If there is no direct

contradiction, the district court "should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).  In *Aerel*, the Sixth Circuit adopted three non-exhaustive factors, originally set forth by the Tenth Circuit in *Franks*, for courts to consider in determining whether the nonmoving party has attempted to use the affidavit to create a sham fact issue:

> [W]hether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.

*Id.* at 909 (quoting *Franks*, 796 F.2d at 1237) (alteration in original).  The first factor, whether the affiant was cross-examined during the earlier testimony, is important because "a party who is cross-examined but nevertheless offers unequivocal testimony, only to be contradicted by a later affidavit, has indeed tried to create a sham fact issue."  *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 593 (6th Cir. 2009).

Defendants argue that each Plaintiff testified in his deposition to not keeping records of their allegedly unpaid time, and that no Plaintiff could provide any specifics as to any lost time or unpaid overtime.  (*See*, *e.g.*, Miller Dep., 91-92, 97, 107-109, 115-116; Crozier Dep., 17-20, 27-30, 51; Tigner Dep., 31-36, 44, 107-109; McEldowney Dep., 11-13, 17, 22-23, 25-27, 31-33, 35, 42-43, 60-61, 97-98; Keegan Dep., 23-26, 49, 89-100, 132; Troyer Dep., 142, 144, 147, 150; Gibbs Dep., 28-29, 32-34, 107; Coleman Dep., 25, 62-63, 67, 114, 115; Johnson Dep., 92-94, 100-101.)  Plaintiffs argue that they attended their depositions armed with evidence, but that Defendants deliberately did not ask Plaintiffs about specifics and did not permit Plaintiffs to refer to their documents.  (Doc. 179 at 5.)  The affidavits, therefore, simply supplemented the record

13

that Defendants deliberately failed to develop at Plaintiffs' depositions.  (*Id.* at 9-10.)  The Court

will consider each Plaintiff's deposition below.

Each Plaintiff's affidavit is the same, providing, in considerable detail:

> each shift I worked by job description and occupation (tipped versus non-tipped
> versus dual job occupation), the date of the shift, the day of the week of the shift,
> my scheduled start time, my arrival time, the time I began working, the "Time In"
> Defendants recorded in my Weekly Time and Attendance Report, the time my
> "Cashout" report was printed, the "Time Out" Defendants recorded on my
> Weekly Time and Attendance report, the time I actually stopped working for the
> shift, my departure time from the restaurant, the hours Defendants recorded for
> my shift, my regular rate designation or my overtime designation, my rate of pay
> as determined by Defendants, the proper rate of pay I should have received, the
> wages Defendants paid me, the calculated wages I should have received for each
> shift I worked, the actual hours I worked, the amount of wages which Defendants
> underpaid me, the credit card or "CC Tips" reflected on my "Checkout", the tips I
> declared for the shift, the actual credit card tips reflected on my "Checkout", the
> actual tips I declared, the amount of tips Defendants under or over reported on my
> behalf, the amount of tip share Defendants illegally confiscated from me and
> distributed to their illegal tip splitting and tip pooling arrangement, and any
> additional notes necessary for me to clarify the errors contained in the
> Defendants' Weekly Time and Attendance Reports.

(Miller Aff't, Miller Doc. 172 at ¶ 3; Crozier Aff't, Crozier Doc. 82-2 at ¶ 3; Coleman Aff't,

Coleman Doc. 80-2 at ¶ 3; Gibbs Aff't, Gibbs Doc. 85 at ¶ 3; Johnson Aff't, Johnson Doc. 101 at

¶ 3; Troyer Aff't, Troyer Doc. 85 at ¶ 3; Tigner Aff't, Tigner Doc. 83-1 at ¶ 3; McEldowney

Aff't, McEldowney Doc. 83 at ¶ 3; Keegan Aff't, Keegan Doc. 87 at ¶ 3.)  The exhibits attached

to Plaintiffs' affidavits do not actually provide all of the information indicated, but the Court will

address issues with the affidavits only where relevant.  The Court will now turn to whether each

Plaintiff's deposition contradicts his or her detailed affidavit.

a.  Miller

With respect to Miller's deposition, Defendants are correct: a theme winding its way

through Miller's deposition is that, at the time of his deposition, he had no idea what damages he

was claiming, or how they were calculated.  For example, when discussing how Miller calculated

14

nine weeks of improperly unpaid vacation time, he explained that Mr. Oberhousen[9] "would be more able to explain it than I would." (Doc. 156-2, at 46.)  When asked about bonuses (termed "LTEs," or long-term employee bonus), he said "No, I don't specifically know the number of LTEs—no, I'm sorry." (*Id.* at 57.)  Miller responded "I mean, no…" when asked the question, "As we are sitting here today, do you know what your damages are?  Do you know how much in dollars your damages are?" (*Id.* at 59.)  He also said "No…" to the question "…do you have any independent information of what time, in fact, you clocked out those [punch-edited] days?" (*Id.* at 109.)  Although Mr. Miller reviewed documents in preparation for his deposition, including "updated" damages figures provided by Mr. Oberhousen, he did not bring these updated figures to his deposition such that he could answer, intelligently, questions about the amount of damages he claimed and how they were calculated. (*Id.* at 51-2.)  At his deposition, Mr. Miller did not provide a single start time or end time for a single day worked at Abuelo's.

The contrast between Mr. Miller's deposition and his affidavit is stark.  Mr. Miller's affidavit provides hundreds of pages of detailed answers to the questions that Mr. Miller could not answer at his deposition.  Miller is incorrect that his affidavit simply supplements his deposition testimony or that Defendants hid the ball.  His affidavit directly contradicts his deposition testimony.  In other words, Miller has not provided a "persuasive justification for the contradiction." *Aerel*, 448 F.3d at 908.  As the examples above illustrate, Defendants asked numerous questions at Miller's deposition aimed at how, and with what information, Miller calculated his damages.  Miller simply did not have the knowledge or information to provide answers.  Because Miller's affidavit directly contradicts his deposition testimony, the Court will not consider it. *See*, *e.g.*, *Kelso*, 77 F. App'x at 833-34 (district court properly did not consider affidavit testimony that a witness "states that she saw police officers at the accident scene lean

---

[9] Mr. Oberhousen is Plaintiffs' disqualified expert.

their heads into Noble's minivan[,]" when that witness testified during her deposition that she "could not get close enough to see what officers were doing around Noble's minivan.")

### b. Crozier

Mr. Crozier provided some general information on damages at his deposition, but he also could not provide the specifics contained in his affidavit.  For example, Mr. Crozier testified at his deposition that he began working at Abuelo's on August 21, 2010, and stopped working at Abuelo's around July 23, 2012.  (Crozier Dep., Crozier Doc. 75-2, at 7.)  He started as a server, but by April or May of 2011, he began working 4-5 times per week as a shift lead.  (*Id.* at 8.)  He also started training new hires around the same time he became a shift lead.  (*Id.*)  As a server, Mr. Crozier would typically work nights—from 4:00 or 4:30 p.m. until 10:30 or 11:00 p.m. on Saturday nights, and from 4:00 or 5:00 p.m. until 9:00 or 10:00 p.m. on weeknights.  (*Id.*)  Mr. Crozier testified that he should have received a LTE bonus in 2011, but did not, (*id.* at 16), and he should have received a one-week vacation, which he requested in November of 2011, but did not.  (*Id.*)  He referred to a stack of punch-edits that he brought with him to his deposition, and pointed out an issue he saw with a punch edit from January 22, 2011.  (*Id.* at 17-18.)  Mr. Crozier testified that he regularly worked off the clock to finish his side work (which took anywhere from 30 minutes to one hour per shift), though he did not have any examples.  (*Id.* at 19-24.)  He testified that he would clock in to complete side work at the beginnings of his shifts,  (*id.* at 36), and that he was not paid for a two-to-three hour training quiz completed on his first day of work.  (*Id.* at 31.)  Mr. Crozier had no documentation or examples to substantiate his claims for 1,500 minutes of unpaid overtime, 41,120 minutes of off-the-clock regular time, 5,760 minutes in unpaid training time, or $235 of tips added by punch-edit.  (*Id.* at 20, 27-28, 33.)

Mr. Crozier's deposition directly contradicts his affidavit.  Although Mr. Crozier had more information at his deposition than did Mr. Miller, his affidavit provides hundreds of pages of detailed answers to the questions that Mr. Crozier could not answer at his deposition.  Mr. Crozier is incorrect that his affidavit simply supplements his deposition testimony or that Defendants hid the ball.  Because Mr. Crozier's affidavit directly contradicts his deposition testimony, and because Plaintiff did not provide a persuasive justification for the contradiction, the Court will not consider it.  *Kelso*, 77 F. App'x at 833-34; *Aerel*, 448 F.3d at 908.

### c.  Coleman

Like Mr. Crozier, Ms. Coleman provided some generalities regarding her time worked at Abuelo's, but she did not provide any specifics.  She also testified more than once that, although Mr. Oberhousen asked her the same types of questions, she could not provide specifics to Mr. Oberhousen, either.  (Coleman Dep., Doc. 73-2, at 48, 60, 99-100.)

As to the generalities, she mentioned that, for a period of time where she served as shift lead, she worked Mondays through Fridays from 10:30 a.m. until 4:00 p.m.  (*Id.* at 9-10.)  She typically arrived thirty to sixty minutes before these shifts, (*id.* at 12, 62), but she typically could not clock in until her scheduled time, 10:30 a.m.  (*Id.* at 16.)  She estimated that at least sometimes she would spend fifteen or thirty minutes performing opening duties, (*id.* at 22, 41), and twenty-five to thirty minutes performing post-shift duties, although she endeavored at times to complete her post-shift duties *during*, rather than after, her shift.  (*Id.* at 45.)  She does not know when she would clock in—sometimes, she would try to clock in early, and sometimes she would "forget" to clock in until her first table, fifteen or twenty minutes after her start time.  (*Id.* at 63-64, 68-69, 90.)  She had no specific clock-out time; sometimes, she helped her fellow employees and sometimes she had to wait around for other reasons.  (*Id.* at 46-47.)  She

estimated that she would clock out at the same time that she checked out approximately seventy percent of the time. (*Id.* at 82.) She was never disciplined for being late. (*Id.* at 90-91.) When asked about how she calculated the hours spent working off the clock, Ms. Coleman did not know, nor did she know how many hours she is claiming she was not properly paid. (*Id.* at 50, 59, 107-08.)

Ms. Coleman also estimated that she spent eighty to ninety percent of her time as a shift lead training others, although she has no documentation of her time spent training. (*Id.* at 51-55.) She began this grueling training schedule approximately two months after starting work at Abuelo's. (*Id.* at 55.)

By contrast, Ms. Coleman provided specifics—daily start times, end times, daily time off-the-clock, etc., in her affidavit. Ms. Coleman is incorrect that Defendants did not ask her about specifics in her deposition. Because her deposition directly contradicts her affidavit, and because Ms. Coleman did not provide a persuasive justification for the discrepancies, the Court will not consider her affidavit. *Kelso*, 77 F. App'x at 833-34; *Aerel*, 448 F.3d at 908.

d. <u>Gibbs</u>

Defendants point to pages 28-29, 32-34, 52-53, and 107 of Plaintiff Gibbs' deposition to argue that his deposition directly contradicts his affidavit. (Doc. 178 at 10; Doc. 180 at 8.) These excerpts of Gibbs' deposition, however, do not directly contradict his affidavit. In pages 28-34, Mr. Gibbs is explaining his methodology for estimating his unrecorded time. (Gibbs Dep., Doc. 77-2, at 28-34.) Directly following this testimony, Mr. Gibbs lists dozens of start times that he testifies are incorrect, and compares these start times with what he believes to be are his scheduled times for those days. (*Id.* at 34-38.)

Pages 52-53 of Gibbs' deposition refer to allegedly misrecorded tips. (*Id.* at 52-53.) Mr. Gibbs' affidavit does not enumerate misrecorded tips. Therefore, the affidavit does not contradict the deposition testimony. Mr. Gibbs testifies on page 107 that he provided Mr. Oberhousen the same sorts of estimates that he provided during his deposition. (*Id.* at 107.)

Plaintiffs' argument that the affidavits fill gaps in deposition testimony, (Doc. 179 at 5-10), rings true with Plaintiff Gibbs. Defense counsel rejected Mr. Gibbs' offer to provide further documentation. (Gibbs Dep., Doc. 77-2, at 14.) Mr. Gibbs provided the same sort of estimates to his expert that he did during his deposition. For these reasons, Mr. Gibbs' deposition does not directly contradict his affidavit, nor does it reflect an attempt to create a sham issue of fact. *See Aerel*, 448 F.3d at 909. The Court will consider Mr. Gibbs' affidavit.

### e. Johnson

Johnson's affidavit, like that of Plaintiff Gibbs, does not directly contradict her deposition. In arguing that it does, the Defendants point to pages 38-39, 92-94, and 100-101 of her deposition. (Johnson Doc. 92-2.) On pages 38-39, Ms. Johnson testified that she did not keep contemporaneous records of unrecorded time spent working at Abuelo's, but that she would typically arrive fifteen to twenty minutes before her shift. On pages 92-94, Ms. Johnson testified that there are documents that support the amount of time she spent working as a bartender for Abuelo's but not being paid. These documents consisted of "[t]he spreadsheets and algorithms and work that Mr. Oberhausen [sic] has done to be able to calculate." (*Id.* at 92.) She continued, testifying that four estimates of underpaid work time contained in her interrogatory answer number five are inaccurate, and that she does not know the accurate numbers. (*Id.* at 80, 93.) She notes that the accurate figures are contained on the "multiple" spreadsheets and documents she reviewed in preparation for her deposition. (*Id.* at 94.) Her attorney went on to offer to show

defense counsel the specific documents she reviewed, and defense counsel rejected the offer. (*Id.* at 95-96.)  On pages 100-101, Plaintiff testified that she does not know all her scheduled times off the top of her head, but that she typically arrived fifteen to twenty minutes early for her shift.

Although Ms. Johnson did not know off the top of her head at her deposition the total amount of time for which she estimates she was underpaid, she offered to provide these figures—including spreadsheets and algorithms—to defense counsel during her deposition. Defense counsel declined.  Therefore, the affidavit simply supplements the record rather than contradicts it, and does not reflect an attempt to create a sham issue of fact.  *See Aerel*, 448 F.3d at 909.  The Court will consider Ms. Johnson's affidavit.

### f.  Troyer

Defendants argue that Mr. Troyer's affidavit directly contradicts his deposition testimony, based on pages 85, 110, 112, 142, 144, 147, and 150 of his deposition.  (Doc. 180 at 9.)  Mr. Troyer testified at his deposition that there was "no way to reliably predict which days" he worked off the clock after clocking out, though he also testified that "nearly every shift [he] worked [he] would be performing work off the clock [at the end of a shift]."  (Troyer Dep., Troyer Doc. 77-2, at 84-85.)  He referred defense counsel to Mr. Oberhousen for any specifics. (*Id.*)  He also "d[id] not know if [he] had [his] bartender hours [for 2010.]"  (*Id.* at 110.)  He speculated regarding arrival times on a few specific days, and explained his methodology behind his total estimated damages: extrapolation, for example, estimating an average of thirty-five minutes off the clock per shift.  (*Id.* at 144-50.)

Mr. Troyer's affidavit, which contains detailed time-in and time-out records, indeed conflicts with this deposition testimony.  Because Plaintiff did not provide a persuasive

justification for the contradiction, the Court will not consider his affidavit.  *Kelso*, 77 F. App'x at 833-34; *Aerel*, 448 F.3d at 908.

### g.  Tigner

Defendants argue that Tigner's affidavit conflicts with her deposition, based on deposition pages 31-36, 38, 44, and 107-109.  (Doc. 178 at 10; Doc. 180 at 8.)  In pages 31-36, Ms. Tigner testifies that she does not know how her missing time—off the clock hours, overtime, punch edits—was calculated.  (Tigner Doc. 77-2, at 31-36.)  She testifies that her estimates comprise the entire time she worked at Abuelo's, not just the period of her FLSA claim.  (*Id.*)  She could not break the numbers down.  (*Id.*)  She also testified that her estimates were based on averages rather than specifics: "I had several documents that I reviewed, basically to refresh my memory on shifts that I worked, just didn't remember because it was years ago to know what days, but to give an average of what days that I worked, I reviewed several different schedules." (*Id.* at 38.)  She testified that she did not know "specific days or times" she worked after clocking out.  (*Id.* at 108-09.)

Ms. Tigner's affidavit, which contains detailed time-in and time-out records, conflicts with this deposition testimony.  Because Ms. Tigner did not provide a persuasive justification for the contradiction, the Court will therefore not consider her affidavit.  *Kelso*, 77 F. App'x at 833-34; *Aerel*, 448 F.3d at 908.

### h.  McEldowney

Defendants refer to pages 11-13, 17, 22-23, 25-27, 31-33, 35, 42-43, 60-61, and 97-98 in arguing that Ms. McEldowney's deposition testimony contradicted her affidavit.  Ms. McEldowney testified at her deposition that she spent time before clocking in checking tables and waiting.  (McEldowney Doc. 75-2, at 15-17, 32-34, 42-43.)  She could not remember any

specific days during her deposition, though in her affidavit, she provided these specifics.  (*See*, *e.g.*, Doc. 83 at PAGEID #2408.)  At her deposition, Ms. McEldowney had no memory of when she worked overtime.  (Doc. 75-2, at 60.)  By contrast, in her affidavit, Ms. McEldowney provided minute details about arrival and departure times from work.  (Doc. 83 at 1-136.)  The Court will not consider these portions of Ms. McEldowney's affidavit, because they directly contradict her deposition, and because Ms. McEldowney did not provide a persuasive justification for the contradiction.[10]  *Kelso*, 77 F. App'x at 833-34; *Aerel*, 448 F.3d at 908.

Certain information, however, is contained in both her affidavit and her deposition.  For example, both her affidavit and her deposition pinpoint specific dates where she was unpaid or underpaid for time spent at safety meetings.  (*See id.* at PAGEID #2340; Doc. 75-2 at 17.) Therefore, the Court is entitled to consider this information from either her affidavit or her deposition.

i.  <u>Keegan</u>

Finally, as to Plaintiff Keegan, Defendants argue that, during her deposition, she did not have documentation or specifics regarding her allegedly unpaid time.  (Doc. 178 at 10; Doc. 180 at 8, citing Keegan Dep., Keegan Doc. 77-2, at 23-26, 44-46, 49, 51-53, 89-100, 132.)

When asked about the 81,000 minutes of regular time that she claims she worked and was not paid, Ms. Keegan testified that she did not know any specific dates, and that the estimate was provided by Mr. Oberhousen.  (Doc. 77-2, at 93.)  She also did not know how Mr. Oberhousen derived the 81,000-minute estimate.  (*Id.* at 94.)  The same is true of her estimated 9,865 hours of unpaid overtime.  (*Id.* at 95.)  She did not know how much overtime she worked or made in 2010.  (*Id.* at 95-96.)  She had no documents to determine her scheduled work times, and did not

---

[10] The Court also notes that certain information is contained in Ms. McEldowney's deposition, but not her affidavit.  For example, Ms. McEldowney detailed during her deposition that she spent time running errands for management.  (*Id.* at 25-27.)  She did not include these details in her affidavit.

know how she estimated that $475 had been improperly added to her tips, or even whether the $475 estimate was accurate.  (*Id.* at 97, 99.)

Ms. Keegan's affidavit, which contains detailed time-in and time-out records, conflicts with her deposition testimony.  Because Ms. Keegan provided no persuasive justification for why her affidavit conflicts with her deposition testimony, the Court will not consider her affidavit.  *Kelso v. City of Toledo*, 77 F. App'x 826, 833-34 (6th Cir. 2003).

j.   Linihan and Lucinan

Defendants also argue that Linihan and Lucinan's affidavits contradict their deposition testimony.  For example, Linihan stated in his deposition that he had no documents "related to [his] employment at Abuelo's."  (*See* Doc. 178 at 21.)  In his affidavit, by contrast, he testified in paragraphs 7-10 and 22 about a thumb drive containing certain of the documents necessary to authenticate his affidavit.  (Doc. 85-2, ¶¶ 7-10.)

Lucinan stated in Paragraphs 13 and 20 of his affidavit that Abuelo's allowed hourly employees to work off the clock so that Store #621 could reduce its labor costs.  He further stated that he, as well as other managers, encouraged employees to work off the clock.  In his deposition, however, he said that off-the-clock work was something that did not "happen[ ] during [his] tenure."  (Miro Dep., 178-3, at 130, 132.)  He responded "No, sir" to the question of whether managers besides Mr. DelVecchio allowed employees to work off the clock.  (*Id.*)

Plaintiffs argue that the affidavits merely clarify "details the Defendants do not wish for the Court to be provided."  (Doc. 179 at 11.)  The Court finds that these sections of Linihan and Lucinan's affidavits are not simply clarifications; rather, they directly contradict the witnesses' deposition testimony.  Therefore, the Court will not consider them.

### 3.  Personal Knowledge (*Third-Party Affidavits*)

Federal Rule of Civil Procedure 56(c)(4) requires an affidavit to be made "on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Plaintiffs do not hold Linihan and Lucinan out to be expert witnesses.  Therefore, as held by the Sixth Circuit in an analogous case, "[f]irsthand knowledge or observation is essential and … the testimony must be helpful in gaining a clear understanding of the witness's testimony and a determination of the fact at issue."  *United States v. Olender*, 338 F.3d 629, 638 (6th Cir. 2003).

Defendants argue that Linihan and Lucinan did not have personal knowledge of the events in their sworn affidavits.  (Doc. 178 at 11, 17.)  First, neither witness was employed with Abuelo's during the entire period complained-of, so neither could have personal knowledge of Plaintiffs' "hours, dates, day of week, scheduled start times, arrival times, begin to work times, stop work times, departure times…wage underpayment, [or] tip share contributions."  (*Id.* at 18.)  Second, even if they *were* employed during the entire period, they could not have such detailed knowledge, because they neither worked the exact same shifts as the Plaintiffs, nor kept track of all of this information.  (*Id.* at 15.)  Third, each witness relied on third-party documents, including filings from these cases and Plaintiffs' affidavits.

The Court finds that these witnesses lack personal knowledge of the matters they state in their affidavits to the extent they were not working at Abuelo's during the operative time period, and to the extent they rely on third-party documents.  *See Sapp v. CSX Transp., Inc.,* 2010 WL 4055951, at *3 (M.D. Tenn. 2010) (*aff'd Sapp v. CSX Transp., Inc*., 478 F. App'x 961 (6th Cir. 2012) ("Because Defendant did not produce the documents attached to Gennette's declaration nor identify the witnesses to the agreements in violation of the Court's case management order,

24

the Court concludes that Gennette's declaration and the attached documents should be stricken. Further, to the extent that Dean and English rely on Gennette's declaration and the attached documents, those portions of Dean's and English's declarations are likewise stricken.")  Because the Court must take all reasonable inferences in favor of Plaintiffs, the Court will consider first-hand observations made during the time period where Lucinan and Linihan *did* work at Abuelo's.  Consequently, the Court will consider paragraphs 1-6, 13-15, and 23-25 of Linihan's affidavit,[11] and paragraphs 1-2, 5-9, 14, and 17-19 of Lucinan's affidavit.[12]

### 4.  Evidence Not Produced in Discovery (*All Three Affidavits*)

The third issue Defendants raise with Plaintiffs' proffered affidavits is that they contain hundreds, perhaps thousands, of pages of evidence that Defendants argue Plaintiffs did not produce in discovery.

The operative rules for this dispute are Federal Rules of Civil Procedure 37(b)(1) and 26(e)(1)(A).  Federal Rule of Civil Procedure 37(b)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Federal Rule of Civil Procedure 26(e)(1)(A) provides:

> A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response: in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

---

[11] The Court has already found that paragraphs 7-10 and 22 directly conflict with Mr. Linihan's deposition, and has determined to disregard these paragraphs.

[12] The Court has already found that paragraphs 13 and 20 directly conflict with Mr. Lucinan's deposition, and has determined to disregard these paragraphs.

Because the Court is not considering the affidavits of Plaintiffs Miller, Crozier, Coleman, Troyer, Tigner, or Keegan, nor is the Court considering significant portions of McEldowney's, Linihan's, and Lucinan's affidavits, the Court need not consider this deficiency as it relates to these affidavits.  As to the evidence remaining—the exhibits attached to the affidavits of Plaintiffs Gibbs and Johnson— the Court notes that the parties' briefing is not clear on what exactly Plaintiffs produced.  However, because the Court's consideration *vel non* of this issue as it relates to these affidavits does not affect the outcome on summary judgment, the Court need not reach it.

In summary, the Court **GRANTS** in part and **DENIES** in part Defendants' motion to strike.  In particular, the Court will not consider the affidavits or supporting documentation of Plaintiffs Miller, Crozier, Coleman, Troyer, Tigner, McEldowney (to the extent referencing time worked off the clock or unpaid overtime), or Keegan, because these affidavits directly conflict with the Plaintiffs' respective depositions.  The Court will also not consider paragraphs 13 or 20 of Lucinan's affidavit, or paragraphs 7-10, or 22 of Linihan's affidavit, because these portions of their affidavits directly conflict with their deposition testimony.  Finally, the Court will not consider the portions of Lucinan's or Linihan's affidavits for which these witnesses lack personal knowledge—paragraphs 11-12 and 16-21 of Linihan's affidavit, and paragraphs 3-4, 10-12, and 15-16 of Lucinan's affidavit.

### III.  MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."

26

*Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The party who has the burden of proof at trial must "make a showing sufficient to establish the existence of [each] element that is essential to that party's case." *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003).  The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Liberty Lobby*, 477 U.S. at 251-52). In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the non-moving party's favor.  *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party.  *See Liberty Lobby,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

## A. Breach of Contract

To recover for breach of contract under Ohio law, Plaintiffs must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Greenzalis v. Nationwide Mut. Ins. Co*., 2016-Ohio-8344, ¶ 20 (Ohio App. 10 Dist. 2016) (internal quotation omitted). Defendants argue that Plaintiffs have failed to show that a contract existed between Plaintiffs and Defendants. In the alternative, Defendants argue that summary judgment must be granted to the individual defendants DelVecchio and Myers because they lack privity of contract with Plaintiffs. The Court will address each *seriatim*.

### 1. Existence of a Contract

The starting point for a breach of contract claim is whether a contract existed. *Greenzalis*, 2016-Ohio-8344, ¶ 20. Defendants argue that Plaintiffs were employed at-will rather than by contract. (Doc. 156 at 11-14.) Defendants support this argument primarily with the assertion that their employee handbook did not constitute a contract. Defendants also argue that Plaintiffs could not prove that the parties entered into any "oral contracts." Finally, they argue that the miscellaneous documents asserted by Keegan, and the time spent traveling in preparation for litigation claimed by McEldowney, do not constitute contracts.

Plaintiffs argue that the "employee handbook, written policies and procedures, and other unwritten policies and procedures" constituted contracts. (Doc. 171 at 32.) Plaintiffs point to the statement of 30(b)(6) witness Kasey Whitten that Whitten described the employee handbook as "our policy, our guideline." (*Id.* at 33.) Second, Plaintiffs argue that Defendants should be estopped from arguing that the employee handbook is not a contract. (*Id.* at 35-36.)

28

a.  Employee Handbook (All Plaintiffs)

Without an agreement to the contrary, an employment agreement under Ohio law "is regarded as an employment at will which can be terminated at any time" by either the employer or the employee. *McIntosh v. Roadway Express, Inc.*, 94 Ohio App. 3d 195, 200 (Ohio Ct. App. 1994). An employee handbook may alter the terms of an at-will employment in the form of an implied contract, but only "if the employer and the employee have agreed to create a contract from the writing." *Seta v. Reading Rock, Inc.*, 100 Ohio App. 3d 731, 737-38 (Ohio App. 12th Dist. 1995). Absent "mutual assent, a handbook is simply a unilateral statement of rules and policies that creates no obligation or rights." *McIntosh*, 94 Ohio App. at 200; *Taylor v. St. Vincent's Med. Ctr.*, No. 97-3236, 1998 WL 211765, at *3 (6th Cir. Apr. 22, 1998). To turn an employee handbook into a binding contract, both the employer and the at-will employee "must expressly agree to modify the employment relationship." *Seta*, 100 Ohio App. 3d at 738 (quoting *Humphreys v. Bellaire Corp.*, 764 F. Supp. 489, 493 (S.D. Ohio 1991)).

Disclaimers contained in the employee handbook and in acknowledgments of receipt signed by employees show an intent not to be contractually bound by the terms of the handbook. *Taylor*, 1998 WL 211765, at *4 ("When [employee] was given a copy of the employee handbook, he signed an acknowledgment that the terms of the handbook are not to be construed as a contract of employment, and that the employee is an employee 'at will.' Under these circumstances, neither [employer] nor [employee] indicated a desire to bind itself by the terms of the employee handbook. Therefore, under Ohio law, the employee handbook did not create a contract of employment."); *McIntosh*, 94 Ohio App. at 201 ("We find that the Code's general disclaimer[, which provides that 'company policies, practices and procedures set forth herein…are for information only and are not intended to be construed as creating contractual

29

obligations',] manifests [employer's] intent not to be contractually bound by the policy statements and procedures contained in its Code.  Therefore, it does not give rise to an implied contract of employment."); *Seta*, 100 Ohio App. 3d at 738 ("Second, the provision in [employer's] policy that 'the Company reserves the right to modify this policy at any time' implies that the disciplinary rules and procedures are not perpetual, but subject to whatever revision and amendment [employer] deems appropriate.  Given such unpredictability, it seems incongruous that [employer's] policy could provide the basis for an implied contract of employment.")

The employee handbook in this case, and the acknowledgment of receipt signed by Plaintiffs upon their employment, shows Defendants' intent not to be bound by their employee handbook.  The employee handbook includes the following disclaimer:

> This handbook has been prepared to introduce you to our Company.  It will acquaint you with the policies, rules, pay and benefits, which apply to all employees at Abuelos International, L.P.  **This information is presented as matter of information only and its contents should not be interpreted as a contract between the Company and any of its employees**.
>
> Please read this handbook carefully and keep it handy for future reference.  One of your first responsibilities is to be familiar with its contents.  **This handbook is only a summary of our policies, however,** so please review it with your supervisor or the corporate Human Resources department if you have any questions.
>
> \*\*\*
>
> **Since our business is constantly changing, we expressly reserve the right to change any of our policies, including those covered here, at any time**….No supervisor or manager other than the Chief Executive Officer or President of Food Concepts International, L.P. has any authority to alter the foregoing.
>
> \*\*\*
>
> **Your employment with the Company is "at will"** and entered into voluntarily.  You are free to resign at any time, for any reason, with or without notice.

> Similarly, the Company is free to conclude the employment relationship at any time.

(Miller Dep., Ex. 2, at 6) (emphasis added).  Likewise, the acknowledgements of receipt of the handbook signed by Plaintiffs provide:

> This handbook contains policies and rules that apply to me.  I agree to read the Employee Handbook and follow it during my employment with the Company.  **I further understand it may be amended at any time, in which case changes will be communicated to me.**

(Miller Dep., Ex. 3) (emphasis added).   Although Defendants appear to manifest a desire for *Plaintiffs* to follow the employee handbook (requiring Plaintiffs' signature following the sentence "I agree to read the Employee Handbook and follow it during my employment with the Company"), they clearly evince their own intent *not* to be bound by their employee handbook.  Despite this imbalance, an employee handbook does not bind either Plaintiffs or Defendants unless *both* parties manifest their intent to be bound.  *McIntosh*, 94 Ohio App. at 200; *Seta*, 100 Ohio App. 3d at 738.  Because Defendants did not manifest their intent to be bound by the employee handbook, the Court finds that the employee handbook did not create a contract between the parties.

Plaintiffs recognize that "employee handbooks are not in and of themselves a contract for employment." (Doc. 171 at 36.)  Plaintiffs also do not dispute that their employment is or was "at will."  (Doc. 171 at 35, "unfortunately, Plaintiff is not asserting that he has an employment contract or that his employment is anything other than at-will.")  Nonetheless, Plaintiffs' argument misapprehends Ohio contract law.

First, Plaintiffs point to the statement of 30(b)(6) witness Kasey Whitten, albeit with an incorrect citation, that Whitten described the employee handbook as "our policy, our guideline." (Doc. 171 at 33.)  According to Plaintiffs, "our policy, our guideline" is "another term for

agreement." (*Id.*)  This is incorrect.  *See Seta*, 100 Ohio App. 3d at 738 ("In the absence of

mutual assent, a handbook is simply a unilateral statement of rules and policies that creates no

obligations or rights.").

Next, Plaintiffs make an estoppel argument, arguing that Defendants made

representations in the employee handbook, "and Plaintiff[s], in reliance upon those

representations, performed to Plaintiff[s'] detriment.  … In reliance upon these representations

contained in the employee handbook, the job descriptions, the representations of Defendants

regarding time recording practices, representations regarding tip pooling, representations

regarding vacation policy, and representations regarding tip credit.  Plaintiff[s] relied, to his

detriment upon Defendants' oral and written representations, and, as a result, Plaintiff[s] suffered

a financial harm…." (Doc. 171 at 35-36.)  Plaintiffs assert that they were "under the impression

and belief" that they were bound by the employee handbook.  (*Id.* at 36.)

Plaintiffs "may not defeat summary judgment by asserting a claim that [they] did not

plead in the complaint."  *Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1017 (S.D.

Ohio 2007), citing *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787-

88 (6th Cir. 2005).  Plaintiffs' estoppel argument is unavailing because, over the course of

complaints and amended complaints, Plaintiffs never brought, or even attempted to bring, an

estoppel claim.  Even Plaintiffs recognize that they never brought such a claim because, to the

extent the Court dismisses their contract claim, they seek, "[a]t the very least," recognition of "an

equitable estopple [sic] or promissory estopple [sic] claim."  (Doc. 171 at 37.)

This case is similar to *Tucker*, where the Sixth Circuit affirmed the district court's

decision to disregard a promissory estoppel claim that the plaintiff raised for the first time in

opposition to the defendant's motion for summary judgment.  407 F.3d at 789.  Tucker had

initially brought a lawsuit seeking to compel the defendant to arbitrate her termination pursuant to a contract—a collective bargaining agreement—that she erroneously believed applied to her. *Id.* at 786. Like Plaintiffs here, Tucker waited until her response to the defendant's motion for summary judgment to raise a promissory estoppel claim in the event her contract claim failed. *Id.* at 786-87. The Sixth Circuit affirmed the district court's decision to disregard the claim because Tucker did not plead promissory estoppel or "put Defendants on notice of her promissory-estoppel claim[,]" and because Tucker "had the information on which to base these claims in her initial Complaint, or she could have amended her complaint early on in this litigation." *Id.* at 789. The fact that the Sixth Circuit found some merit in Tucker's promissory estoppel argument did not change its analysis. *Id.* (telegraphing the fact that Tucker "might have a cause of action against her attorney for failing to amend her complaint before the summary judgment stage"). *See also McCurry ex rel. Turner v. Adventist Health System/Sunbelt, Inc.*, 298 F.3d 586, 595 (6th Cir. 2002) ("[T]he case law consistently teaches that out-and-out lawyer blunders—the type of action or inaction that leads to successful malpractice suits by the injured client—do not qualify as 'mistake' or 'excusable neglect' within the meaning of [Rule 60(b)(1)].") (internal quotation omitted).

The Court finds: (a) that the employee handbook did not form a contract between the parties; and (b) Plaintiffs cannot amend their complaint in response to Defendants' motion for summary judgment to bring an estoppel claim.

b. Verbal Agreements (All Plaintiffs), Miscellaneous Documents (Keegan), and Travel Time (McEldowney)

Verbal representations "may give rise to implied contractual provisions that alter the terms of an oral at-will employment relationship." *McIntosh*, 1994 Ohio App. at 200. Although Plaintiffs repeatedly reference "oral contracts," they fail to mention any. Instead, they send the

33

Court on a merry-go-round of the various sections of their Responses to Defendants' Motion for Summary Judgment: Sections B reference Sections D, which in turn reference Sections B and E. (Doc. 171 at 37, 48.)  None of the sections—B, D, or E—details a single thing spoken by Defendants to Plaintiffs.  The Sixth Circuit has held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir.1997) (citation omitted).  Plaintiffs have not even provided a scintilla of evidence of an oral contract. *See Liberty Lobby*, 477 U.S. at 251.

Defendants also point out that Plaintiffs Keegan and McEldowney identified in their depositions additional breached "contracts."  Keegan pointed to documents such as letters from her attorney, payroll records, vacation requests, and job descriptions.  (Keegan Doc. 77, at 15-17.)  McEldowney posited that Defendants breached a contract in the form of her travel time to and from her attorney's office, and to and from court.  (McEldowney Doc. 75, at 15).

As to Keegan, Defendants argue that the various documents cited could not constitute contracts with Defendants because Keegan did not review them until the instant litigation.  (Case 2:13-cv-00134, Doc. 77, at 17.)  It follows, Defendants argue, that Plaintiff Keegan could not have formed a "meeting of the minds" with Defendants regarding those documents if she never saw them.  (*Id.*)  Plaintiffs offer no response.  Regarding McEldowney, Defendants point out the absurdity of the idea that they would contract with Plaintiff to sue them and to pay for her travel in so doing.  (Case 2:13-cv-00133, Doc. 75, at 15).  Any contract regarding travel time for this litigation would be between Plaintiff and her lawyer, not between Plaintiff and Defendants. Again, Plaintiffs offer no response.

A plaintiff abandons a claim when failing to respond to a defendant's motion for summary judgment on the claim.  *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006); *Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D. Ohio 2005) (Plaintiff waived opposition to an argument by failing to address it in his responsive brief).  *See also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute.").  Because Plaintiffs Keegan and McEldowney do not address Defendants' argument and do not offer any contrary evidence to show a meeting of the minds, the Court finds that they have waived the argument that miscellaneous documents or travel time constitute contracts with Defendants.

## 2.  Individual Defendants DelVecchio and Myers

Defendants further argue that Defendants DelVecchio and Myers cannot be held liable for breach of contract because there is no privity of contract between Plaintiffs and these individual defendants.  (Doc. 156 at 19-20.)  Plaintiffs failed to respond to this argument.

Plaintiffs argue instead that the individual Defendants entered into oral and written contracts with Plaintiffs because: (a) Defendants entered into a "written contract for Defendants to act as Plaintiffs [sic] custodial [sic] of funds acknowledged by Defendants [sic] 30(b)(6) witness Whitten"  (Doc. 171 at 48);[13] and (b) Whitten indicated during his deposition that, contrary to a representation made in the employee handbook, managers were not required to sign off on "punch edits" to employees' time.  (*Id.*)

---

[13] Six of the nine Plaintiffs—Troyer, Tigner, Keegan, Gibbs, Crozier, and Coleman—initialed language requesting Abuelo's to safeguard the funds they put in the tip pool: "By signing your initials below, you acknowledge your understanding of the TipSharing/Tip Pooling practice at Abuelo's and you hereby request Abuelo's to act as a custodian for safekeeping of the funds placed in the tip pool."  (Whitten Dep. Ex. 11, Miller Doc. 155-2.)  Three—Miller, McEldowney, and Johnson—did not.  (*Id.*)

Neither of these assertions points to a single statement or writing made by Defendants DelVecchio or Myers.  Plaintiffs do not argue that Defendants DelVecchio or Myers: (a) signed any of the acknowledgement forms requesting Abuelo's to act as custodian of their tip share; or (b) made any representations about punch edits.  The Court has already determined that the handbook and acknowledgement form may not form the basis of Plaintiffs' breach of contract claim.  And Plaintiffs, in failing to respond to Defendants' privity of contract argument, have waived their opposition.  *Clark*, 178 F. App'x at 524-25; *Dage*, 395 F. Supp. 2d at 679.

Because the parties did not enter into a contract that could be breached, and because Plaintiffs may not raise a promissory estoppel claim in response to a motion for summary judgment, the Court **GRANTS** Defendants' motions for summary judgment on Plaintiffs' breach of contract claims.

### B.  FLSA

As pertains to this case, FLSA mandates that employers provide employees with a $7.25 per hour minimum wage.  29 U.S.C. § 206(a)(1)(C).  FLSA also provides for overtime pay: "no employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  *Id.* § 207(a)(1).  An "employer," for the purposes of FLSA, "includes any person acting directly or indirectly in the interest of an employer in relation to an employee…."  *Id.* § 203(d).  An "employee" is "any individual employed by an employer." *Id.* § 203(e)(1).  To "employ" is to "suffer or permit to work."  *Id.* § 203(g).  As damages, a successful FLSA plaintiff could obtain "employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages[,]" together with costs and a reasonable attorney's fee.  *Id.* §216(b).

Defendants do not dispute Plaintiffs' status as employees engaged in commerce, or Food Concepts or Abuelo's status as employers under FLSA.  Instead, they contend: (1) Plaintiffs "failed to state specific damages for the court to grant relief" (Doc. 156 at 15); and (2) the individual Defendants are not "employers" under FLSA.  (Doc. 156 at 20-21.)

## 1.  Specific Damages

An employee claiming unpaid minimum wage or unpaid overtime under FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) (superseded by statute on other grounds).  Because employers are required to keep records of "wages, hours and other conditions and practices of employment[,]" and because employees rarely keep such records, it is the employer who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* at 687.

If the employer keeps "proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Id.*  If the employer's records are "inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises." *Id.*  With the plaintiff retaining the burden of producing evidence to support his FLSA claim, the employer may have an incentive to shirk its recording duties in order to avoid liability. *Id.*  Congress did not intend such a result. *Id.*  To rectify these perverse incentives and to balance the plaintiff's burden with the information disparity inherent in such a situation, the Supreme Court has laid out a rule:

> In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference

37

to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.[14]

*Id.* at 687-88.  In other words, if Defendants do not comply with their recordkeeping duties under FLSA, Plaintiffs have a relaxed burden to prove the extent, but not the fact, of their damages.  If Defendants fail to keep adequate and accurate time records, Plaintiffs are nevertheless "still required to prove that they in fact performed work for which [they were] improperly compensated and to produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Bauer v. Singh*, No. 3:09-cv-194, 2010 WL 5088126, at *9 (S.D. Ohio Dec. 7, 2010).

### a.   Defendants' Recordkeeping Duties

29 C.F.R. § 516.2 requires employers to keep the following employee "payroll records": (1) Name; (2) Home address; (3) Date of birth, if under 19; (4) Sex and occupation in which employed; (5) Time of day and day of week on which the employee's workweek begins; (6)(i) Regular hourly rate of pay for any workweek in which overtime compensation is due under section 7(a) of the Act, (ii) basis of pay, such as rate per hour, and (iii) the amount and nature of extra payments made for periods like vacation and overtime; (7) Hours worked each workday and total hours worked each workweek; (8) Total daily or weekly straight-time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation; (9) Total premium pay for overtime hours; (10) Total additions to or deductions from wages paid each pay period; (11) Total wages paid each pay period; and (12) Date of payment and the pay period covered by payment.  29 C.F.R. § 516.2.

---

[14] *Anderson* is in the posture of a bench trial.  On summary judgment, Plaintiffs need show only an issue of material fact.

29 C.F.R. § 516.5(a) requires employers to preserve these payroll records for at least three years.  29 C.F.R. § 516.6 requires employers to maintain, for at least two years, "all basic time and earnings cards or sheets on which are entered the daily starting and stopping time of individual employees."  *Id.* § 516.6(a)(1).

Defendants argue that Plaintiffs did not "identify any specific failure of Defendants." (Doc. 177 at 16.)  Defendants point out that they actually keep payroll records for seven years (Whitten Dep., Doc. 155, at 95).  These payroll records consist of "the time of day and day of the week on which the workweek began, the regular hourly rate of pay for any workweek, the hours worked each workday and total hours worked each workweek, total daily and weekly earnings, overtime hours worked, additions or deductions, and total wages paid to the employee."  (Doc. 177 at 12, citing 29 C.F.R. § 516.2.)

Plaintiffs argue that Defendants failed to keep proper records.  Much of Plaintiffs' argument relates to the tip-sharing claim that the Court did not allow Plaintiffs to bring when it denied Plaintiffs' motions for leave to file their second amended complaints.  As relates to their wage and hours claims, however, Plaintiffs also argue that Defendants did not keep records for time spent "off the clock," including time spent working before clocking in, time spent working after clocking out, and time spent working on days off.  Some of this unrecorded time would have been overtime, for which Plaintiffs were not paid the statutory time-and-a-half rate.

29 C.F.R. § 516.2(7) requires employers to keep records of "[h]ours worked each workday and total hours worked each workweek."  As counsel admitted during oral argument, Defendants did not keep records for time Plaintiffs spent working "off the clock."  Because Defendants have no record of "off the clock" hours worked, they did not adequately and accurately keep records of "[h]ours worked each workday and total hours worked each

39

workweek." This inadequacy creates a waterfall effect: without the correct number of hours Plaintiffs worked, Defendants also cannot keep adequate records of overtime owed, or whether they are paying Plaintiffs, whose wages are partially comprised of tips, minimum wage. 29 C.F.R. §§ 516.2(8), (9), (11).[15]

Therefore, the Court will apply the relaxed standard of *Anderson*. Plaintiffs must "prove that [they have], in fact, performed work for which [they were] improperly compensated," as well as provide "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.[16]

### b.  Plaintiffs' Evidence

### *(1) Miller*

The Court must assess Miller's evidence without reference to his affidavit. Miller directs the Court's attention, generally, to his deposition, as well as to the affidavits of Lucanin, Linihan, and Nicholas Valentine. (Doc. 171 at 39.) Miller also should have, but did not, direct the Court to his weekly time and attendance reports, attached as exhibit C to Defendants' motion for summary judgment. (Doc. 156-3.)

Although the question is close, and Plaintiff's counsel could have avoided a lot of heartache by preparing Plaintiff for his deposition and supplementing his discovery responses (*see* Doc. 156-2 at 48), the Court finds that Plaintiff Miller has put forth enough evidence to raise

---

[15] Defendants focus a lot of energy on Plaintiffs' failure to maintain any "chits," which Plaintiffs received after each shift, and which would have shown a given Plaintiff's: "(1) time in; (2) time out; (3) scheduled shift hours; and (4) hours worked that workweek." (Doc. 156 at 17; Doc. 177 at 12-13.) As the Supreme Court recognized in *Anderson*, FLSA does not require Plaintiffs to keep detailed records of their time to make out a wage or overtime claim. Employers, however, *do* have a duty to keep records under FLSA. The *Anderson* burden shifting analysis accounts for Plaintiffs' lack of chits: Plaintiffs must prove liability by a preponderance of the evidence, and then may prove the extent of their damages "as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.

[16] The Court notes that Defendants acknowledged the relaxed *Anderson* standard when describing Plaintiffs' burden of proof. (Doc. 156 at 16, ("To meet this burden, Plaintiff must show the amount and extent of that work as a matter of just and reasonable inference."))

a genuine dispute of material fact about whether he was underpaid, as well as his ability to show "the amount and extent of that work as a matter of just and reasonable inference."

Miller explained in his deposition that, per "standard practice," he would clock in not when he arrived at work and started working, but when he received his first table. (Doc. 156-2 at 73-4.) In addition, he had to work sometimes after he clocked out. (*Id.* at 95.) Edward Linihan bolstered Mr. Miller's "off the clock" time claim, stating that: "[b]etween May 26, 2005 and November 5, 2010, it was Abuelo's practice to allow hourly employees to work off the clock so that Store #621 could reduce its labor costs. . . . I also have personal knowledge that J. Miller…, w[as] encouraged by me and other members of the Abuelo's management team to work off the clock for the benefit of Abuelo's Store #621." (Linihan Aff't, Miller Doc. 85-2, at ¶¶ 13, 25.)

Mr. Miller testified that in 2010 he consistently worked as a shift lead, which means he would have to arrive at 4:00 p.m. (*Id.* at 75.) On a Saturday, that start time would be 3:30 p.m. (*Id.* at 77.) Looking at Miller's weekly time and attendance, his "clock-in" times were irregular (i.e. not at 3:30 or 4:00); instead, they were regularly *after* 3:30 or 4:00. (Doc. 156-3.) Although Miller discredited his interrogatory answers where he estimated the total amount of his unpaid wages and hours, (Doc. 156-2 at 48-54), and the Court does not have updated figures, a reasonable jury could take the foregoing and derive a "just and reasonable" estimate of Miller's unpaid wages and hours.[17]

---

[17] Defendants point to *Millington v. Morrow County Board of Commissioners*, No. 2:06-cv-347, 2007 WL 2908817 (S.D. Ohio Oct. 4, 2007), *Simmons v. Wal-Mart Assocs., Inc.*, No. 2:04-cv-51, 2005 WL 1684002 (S.D. Ohio July 19, 2005), and *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 572 (6th Cir. 2009) in arguing that Plaintiffs have not met their evidentiary burden. These cases are distinguishable. In *Millington*, Plaintiff filled out his own time sheets. 2007 WL 2908817, at *12. This Plaintiff estimated that he worked (from home), but was not paid, for an average of five hours per week. *Id.* at *17. He had no evidence except for his estimate. *Id.* at *19. In *Simmons*, Plaintiff offered no evidence besides a bald assertion that he had to work a certain number of times off the clock. 2005 WL 1684002 at *29. The Plaintiffs in this case have time and attendance sheets, which they compared, or could compare, with their estimated typical schedules. Defendants cite *O'Brien* for the proposition that "where an employee was

*(2) Crozier*

At his deposition, Mr. Crozier testified that he started at Abuelo's on August 21, 2010, and quit around July 23, 2012.  (Crozier Dep., Crozier Doc. 75-2, at 7.)  He worked as a server from August 2010 until about April or May of 2011, when he picked up shift lead and trainer duties.  (*Id.* at 7-8.)  He worked as a shift lead approximately four to five times per week, and trained new hires as they were hired.  (*Id.*)  As a server, Mr. Crozier would typically work nights—from 4:00 or 4:30 until 10:30 or 11:00 on Saturday nights, and from 4:00 or 5:00 p.m. until 9:00 or 10:00 p.m. on weeknights.  (*Id.*)  As a shift lead, he typically worked mornings— roughly, from 10:30 a.m. until 4:30 or 5:00 p.m.  (*Id.* at 8.)  Mr. Crozier testified that he regularly worked off the clock to finish his end-of-shift side work (which took anywhere from 30 minutes to one hour per shift), (*id.* at 19-24) but that he would clock in to complete side work at the beginning of his shifts.  (*Id.* at 36.)  Mr. Crozier estimated that he worked 1,500 minutes in unpaid overtime and 41,120 minutes in off-the-clock regular time.  (*Id.* at 19, 27.)

Edward Linihan bolstered Mr. Crozier's claim that he worked off the clock: "[b]etween May 26, 2005 and November 5, 2010, it was Abuelo's practice to allow hourly employees to work off the clock so that Store #621 could reduce its labor costs. . . . I also have personal knowledge that T. Crozier…, w[as] encouraged by me and other members of the Abuelo's management team to work off the clock for the benefit of Abuelo's Store #621."  (Linihan Aff't, Miller Doc. 85-2, at ¶¶ 13, 25.)  Mr. Crozier's time and attendance reports provide a means of estimating his off-the-clock work, because his listed "time out" is frequently before he typically clocked out.  (Doc. 75-3.)

---

unsure and could offer no proof that her timecard was altered, her time-alteration claim was insufficient to survive summary judgment."  575 F.3d at 602.  In the instant cases, the relevant Plaintiffs have punch-edits showing that their time was altered.

Mr. Crozier also testified to an irregularity contained in a punch-edit, and estimated that his supervisors improperly declared for him an extra $235 of tips.  (*Id.* at 17-18, 33-34.)  Mr. Crozier estimated that he was not paid for 5,760 minutes in unpaid training time, including, for example, a two-to-three hour training quiz completed on his first day of work.  (*Id.* at 31.)

Through his deposition testimony and his time and attendance report, Mr. Crozier has raised genuine disputes of material fact regarding whether "he has in fact performed work for which he was improperly compensated[,]" as well as "the amount and extent of that work as a matter of just and reasonable inference."  *Anderson*, 328 U.S. at 687.

### *(3) Coleman*

Ms. Coleman testified at her deposition that, for a period of time, she regularly worked Mondays through Fridays from 10:30 a.m. until 4:00 p.m.  (Coleman Dep., Doc. 73-2, at 9-10.) She would almost always arrive and begin working thirty to sixty minutes before these shifts, (*id.* at 12, 62), but she typically could not clock in until her scheduled time, 10:30 a.m.  (*Id.* at 16.) Opening duties could take thirty minutes, and so could closing duties.  (*Id.* at 22, 41, 45.)  She did not always clock in at her scheduled start time—sometimes, she clocked in early, and sometimes, she clocked in when she received her first table.  (*Id.* at 63-64, 68-69, 90.) Scheduled start times could range from 10:30 a.m. to 12:00 p.m. for the morning shift (on the quarter-hour), or 4:00 to 6:00 p.m. for the evening shift.  (*Id.* at 64.)  Ms. Coleman was never disciplined for being late.  (*Id.* at 90-91.)  Mr. Linihan testified that he had personal knowledge that Ms. Coleman was "encouraged by me and other members of the Abuelo's management team to work off the clock for the benefit of Abuelo's Store #621."  (Linihan Aff't, Miller Doc. 85-2, at ¶¶ 13, 25.)

In addition, before the Court are Ms. Coleman's time and attendance sheets, which include clock in and clock out records from December 28, 2009 until December 22, 2010.  (Doc. 73-4.)  While the Court does not have Ms. Coleman's scheduled clock-in times, she testified that she was frequently scheduled to arrive at 10:30 a.m. (Coleman Dep., Doc. 73-2, at 9-10.)  She further testified that servers were scheduled to arrive at various times on the quarter-hour.  (*Id.* at 64.)  Ms. Coleman's "Time In" records have very few arrival times fitting these descriptions.  (Doc. 73-4.)  For example, on October 28, 2010, her "Time In" is 10:56 a.m., and on December 13, 2010, her "Time In" is 10:47 a.m.  (*Id.*)  Taking these facts in the light most favorable to Plaintiff, and drawing all reasonable inferences therefrom, a reasonable jury could find that Plaintiff performed work for which she was not properly compensated and come up with an estimate, "as a matter of just and reasonable inference," of "the amount and extent of that work." *Anderson*, 328 U.S. at 687.

## (4) *Gibbs and Johnson*

The Court has found that it can consider the affidavits of Plaintiffs Gibbs and Johnson. (Gibbs Doc. 77-2; Johnson Doc. 92-2.)  These affidavits provide detailed estimates for time each Plaintiff spent working off the clock.  It is not the province of the Court to test the credibility of the estimates.  *Liberty Lobby*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.")  The Court finds that Plaintiffs Gibbs and Johnson have put forth enough evidence to survive summary judgment.  A reasonable jury could find that Plaintiffs Gibbs and Johnson have performed work for which they were not properly compensated, as well as estimate "the amount and extent of that work as a matter of just and reasonable inference."  *Anderson*, 328 U.S. at 687.

*(5) Troyer*

Mr. Troyer testified at his deposition that he worked off the clock.  Specifically, as a server, he was instructed to clock in when he received his first table.  (Troyer Dep., Troyer Doc. 77-2, at 65.)  Mr. Linihan affirmed that Mr. Troyer was "encouraged by me and other members of the Abuelo's management team to work off the clock for the benefit of Abuelo's Store #621." (Linihan Aff't, Miller Doc. 85-2, at ¶¶ 13, 25.)

Mr. Troyer spent anywhere from one to thirty minutes per shift working prior to receiving his first table, and spent approximately twenty minutes doing side work at the end of his server shift.  (*Id.* at 68.)  Mr. Troyer had regular server shifts during Darren DelVecchio's time as General Manager of Store #621, and he also worked as a shift lead and a bartender.  (*Id.* at 65-67).  When Mr. Troyer was working as a shift lead, which he frequently did in the mornings, he arrived at work at 10:30 a.m.  (*Id.* at 53.)

Mr. Troyer's case is somewhat unique in that he was able to compare his clock-in and clock-out times to his scheduled times, at least for the week of April 29 through May 5, 2010. (*Id.* at 25-26.)  On April 30, he was scheduled to arrive at 10:30 a.m., although he did not clock in until 11:20 a.m.  (*Id.* at 30.)  Mr. Troyer also reviewed his punch edits during his deposition. Oh February 23, 2011, for example, his time-in was adjusted to 10:25 a.m., when he was working as a bartender, and bartenders are scheduled for 9:30 a.m.  One day, his "in" time was adjusted to 7:00 p.m., when he would have arrived at 4:00, 5:00, or 5:30 p.m.  (*Id.* at 36.) Although he had been late before, Mr. Troyer had never been an entire hour late.  (*Id.* at 52.)

Mr. Troyer testified that his morning start times were 10:30, 11:00, or 11:30 a.m.  (*Id.* at 32.)  Looking at his weekly time and attendance, with the exception of seven instances, Mr. Troyer did not clock in at 10:30, 11:00, or 11:30.  (Doc. 77-3.)

Mr. Troyer has met his burden to raise a genuine dispute of fact that he performed work for which he was not properly compensated.  Mr. Troyer has also provided sufficient evidence to allow a reasonable jury, "as a matter of just and reasonable inference," to estimate "the amount and extent of that work."  *Anderson*, 328 U.S. at 687.

### (6) Tigner

Ms. Tigner testified at her deposition that she spent time working off the clock.  (Tigner Dep., Tigner Doc. 77-2, at 11.)  Mr. Linihan bolstered Ms. Tigner's claim, stating that she was "encouraged by me and other members of the Abuelo's management team to work off the clock for the benefit of Abuelo's Store #621."  (Linihan Aff't, Miller Doc. 85-2, at ¶¶ 13, 25.)

Ms. Tigner also testified that, unless she picked up extra shifts, she worked a set schedule as a bartender: 9:00 a.m. to 5:00 p.m., Monday through Friday.  (*Id.* at 41.)  She arrived at work at 9:00 a.m. and clocked out at 5:00 p.m., but her extra duties frequently required her to work off the clock until 6:00 p.m.  (*Id.* at 43, 50.)  For example, she would put the liquor away on Thursday evenings, and she would put the beer away and check inventory on Tuesday evenings. (*Id.* at 44.)  Her managers told her they would use punch-edits to add that time, but they did not. (*Id.*)  Ms. Tigner also worked as a server/shift lead, for which her hours would be from 10:30 a.m. until 4:00 p.m. or 5-5:30 p.m., depending on how long people remained at her tables.  (*Id.* at 55.)

Ms. Tigner's time and attendance sheet shows frequent clock-ins after 9:00 a.m. and frequent clock-outs before 5:00 p.m.  (Tigner Doc. 77-3.)  Ms. Tigner has met her burden to raise a genuine dispute of fact that she performed work for which she was not properly compensated, and to provide evidence from which a reasonable jury can estimate "the amount and extent of that work as a matter of just and reasonable inference."  *Anderson*, 328 U.S. at 687.

*(7) McEldowney*

Plaintiff McEldowney testified in her deposition that she typically worked nights on Tuesdays, Wednesdays, Thursdays, Fridays, and Saturdays.  (McEldowney Dep., McEldowney Doc. 75-2, at 7.)  She also worked Saturday mornings.  (*Id.*)  On weeknights, she would be scheduled to start working at 5:00 or 5:30 p.m., and on Saturday she would begin at 10:30 a.m.  (*Id.* at 29.)  On weeknights, she usually worked until 10:30 or 10:45 p.m., and on weekend nights, she would work until 11:30 p.m. or midnight.  (*Id.* at 64.)  She arrived at her scheduled start times, (*id.* at 42), and Mr. Linihan confirmed that Ms. McEldowney was "encouraged by me and other members of the Abuelo's management team to work off the clock for the benefit of Abuelo's Store #621."  (Linihan Aff't, Miller Doc. 85-2, at ¶¶ 13, 25.)

When she worked as a server, Ms. McEldowney would work off the clock for up to thirty minutes before receiving her first table.  (*Id.* at 31.)  She spent this time checking tables and waiting on a manager to clock her in.  (*Id.*)  When she worked as a bartender, she sometimes had to wait fifteen minutes before clocking in.  (*Id.* at 34.)  Supervisors also deducted time from her via punch edit.  (*Id.* at 88.)

Ms. McEldowney's weekly time and attendance reports show slightly different numbers. Her "time in" is frequently before, but sometimes after, 5:00 p.m.  (Doc. 75-3.)  When she worked mornings, her "time in" was frequently after 10:30 a.m.  (*Id.*)  Taking the facts in the light most favorable to Ms. McEldowney, a reasonable jury could find that she has shown that she performed work for which she was not properly compensated, and, "as a matter of just and reasonable inference[,]" estimate "the amount and extent of that work."  *Anderson*, 328 U.S. at 687.

*(8) Keegan*

Ms. Keegan testified in her deposition that she worked as both a bartender and a server. (Keegan Dep., Keegan Doc. 77-2, at 8.)  She testified that she worked off the clock, including during liquor runs and marketing for happy hours, before her shifts, and when she taught training classes on her days off.  (*Id.* at 25-27, 31-33, 97, 101.)  She also testified that she was never paid for certain safety meetings.  (*Id.* at 75-76.)  Mr. Linihan affirmed that Ms. Keegan was "encouraged by me and other members of the Abuelo's management team to work off the clock for the benefit of Abuelo's Store #621."  (Linihan Aff't, Miller Doc. 85-2, at ¶¶ 13, 25.)

As a server, Ms. Keegan was scheduled to start work at either 11:00 or 11:30 a.m., and she finished work around 11:00 or 11:30 p.m.  (*Id.* at 97-98, 120.)  If she worked as an opening bartender, she could work until 3:00 or 3:30 p.m.  (*Id.* at 133.)  She was usually on time and has no documentation of her being regularly late to work.  (*Id.* at 98.)  Her time and attendance sheet, however, tells a different story—a story where Ms. Keegan clocked in after her scheduled time. (*Id.* at 116-119.)

Taking these facts in the light most favorable to Ms. Keegan, a reasonable jury could find that she has shown that she performed work for which she was not properly compensated, and, "as a matter of just and reasonable inference[,]" estimate "the amount and extent of that work." *Anderson*, 328 U.S. at 687-88.[18]

In summary, the Court has found that each Plaintiff has carried the burden necessary to defeat summary judgment.  Per *Anderson*, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Id.* at 687-88.

---

[18] Defense counsel pointed out at oral argument that Ms. Keegan's claimed "off the clock" hours may be numerous enough to strain her credibility.  The Court notes, however, that Ms. Keegan's credibility is a question for the jury.  *Liberty Lobby*, 477 U.S. at 255.

Defendants' briefs focus on Plaintiffs' burden and do not take the next step of producing evidence to show "the precise amount of work performed" or that Plaintiffs' estimates are unreasonable.  (Miller Doc. 156 at 15-19; Doc. 17 at 11-21.)  At oral argument, Defendants suggested that at least some Plaintiffs' estimates are so high as to be incredible.  They did not, however, come forward with "evidence to negative the reasonableness of the inference to be drawn" from Plaintiffs' evidence.

For the foregoing reasons, Defendants' motions for summary judgment are **DENIED** as to Plaintiffs' wage and hour claims under FLSA.

## 2.  Tip Share

Plaintiffs spend a substantial portion of their oppositions to Defendants' motions for summary judgment developing several tip-share-related claims, none of which they pleaded in their complaints.  In fact, Plaintiffs attempted to file second amended complaints to add these claims.  The Court denied Plaintiffs' motions to file second amended complaints, in part because "plaintiffs were well aware of the existence and operation of the tip pool at the inception of this case. Many of the facts underlying the tip pool claims, such as who participated in the tip pool, their job duties, and the distribution of tip pool monies, were known to plaintiffs well before the close of discovery."  (Doc. 82 at 8-9.)  Most of the Plaintiffs did not object to the Court's order.

Plaintiffs are incorrect to suggest that their operative complaints already allege tip share claims.  In fact, Plaintiffs' lengthy complaints referenced the word "tip share" only once.  (*See* Doc. 171 at 21; Doc. 177 at 10.)  Plaintiffs' operative complaints allege the following regarding Plaintiffs' FLSA claims:  (a) DelVecchio and others would "reduce the number of hours Plaintiff[s] reported working, including Plaintiff[s'] regular and overtime hours worked, through the Defendants' time-reporting system"  (Doc. 33 at ¶ 142); (b) Myers, DelVecchio, and others

underreported Plaintiffs' time and required Plaintiffs to work off the clock (*id.* at ¶ 143); and

(c) Defendants allowed or required certain employees to work off the clock without recording

time or receiving pay.  (*Id.* at ¶¶ 153-54.)  As a result, Plaintiffs allege that Defendants failed

and/or refused to pay to Plaintiff regular and overtime wages in violation of FLSA; that the

violation was willful; that the violation caused Plaintiffs damages; that Defendants owe Plaintiffs

regular time and overtime; and that Plaintiffs may receive liquidated damages and other

remedies.  (*Id.* at ¶¶ 168-173.)

Plaintiffs sought leave to amend their complaints to add tip-share allegations; the Court

denied Plaintiffs' request.  Had Plaintiffs already alleged these claims in their operative

complaints, they would not have filed for leave to amend their complaints.  Plaintiffs may not

add such claims now.  *Spengler*, 514 F. Supp. 2d at 1017 (citing *Tucker*, 407 F.3d at 787-88

(Plaintiffs "may not defeat summary judgment by asserting a claim that [they] did not plead in

the complaint.")).

The Court therefore **GRANTS** Defendants' motions for summary judgment on Plaintiffs'

FLSA claims, to the extent they attempt to add tip share claims.

### 3.  Individual Defendants DelVecchio and Myers

As stated above, an "employer" "includes any person acting directly or indirectly in the

interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  It is possible for "[a]n

individual, such as a corporate officer with operation control" to be "deemed an 'employer'

under the FLSA along with the business entity itself."  *Bauer*, 2010 WL 5088126, at *16

(quotation omitted).  An "economic reality test" determines whether an individual is an

"employer" under FLSA.  *Cook v. Carestar, Inc.*, No. 2:11-cv-00691, 2013 WL 5477148, at *9

(S.D. Ohio Sept. 16, 2013).  Whether an individual is an "employer" under FLSA is a question of

law for the Court to decide. *Dep't of Labor v. Cole Enters., Inc*., 62 F.3d 775, 778 (6th Cir.

1995).

The economic reality test "prescribes a case-by-case approach, whereby the court

considers 'the circumstances of the whole business activity.'" *Ellington v. City of East*

*Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012). In conducting its inquiry, the Court may consider

the following, non-exhaustive, and non-dispositive factors:

(1) whether the plaintiff is an integral part of the operations of the putative employer;

(2) the extent of the plaintiff's economic dependence on the defendants;

(3) the defendant's substantial control of the terms and conditions of the work of the plaintiff;

(4) the defendant's authority to hire or fire the plaintiff; and

(5) whether the defendant maintains the plaintiff's employment records and establishes the rate and method of payment.

*Id; see also Clark v. Shop24 Global, LLC*, 77 F. Supp. 3d 660, 689 (S.D. Ohio 2015).

Plaintiffs argue that Defendants DelVecchio and Myers are "employers" under FLSA

because DelVecchio managed Store #621 and Myers was DelVecchio's boss. (Doc. 171 at 49-

51.) Defendants argue that they are not "employers" because they are but a blip in one of

hundreds of Abuelo's restaurants—they do not run operations at *Abuelo's*, even if DelVecchio

manages one store, or Myers oversees six. (Doc. 156 at 20-21.)

Plaintiffs do not address each factor listed above, but the record contains the following

evidence: as General Manager, DelVecchio managed day-to-day business at Store #621 in

pursuit of profit and guest satisfaction, including hiring and firing employees at the store level,

and coordinating work schedules. (Doc. 151-2, at PAGEID 7776.) DelVecchio's job included

"[o]versee[ing] all management decision-making and administrative work including . . . human

resources, [and] payroll . . . ." *Id.*  Although he does not appear to have the ability to adjust the method of paying employees, he does "coordinate[] and oversee[] all hourly employee and manager work schedules."  *Id.*  Although Plaintiffs refer to DelVecchio as "local business owner/proprietor," they cite no evidence for this proposition.  (Doc. 171 at 53.)

Myers, who had supervisory authority over six stores, including Store #621, "receive[d] electronic copies of the daily sales and labor report," and reviewed the schedules posted by general managers "to make sure the hours projected were matching the hours that were actually used."  (Doc. 171 at 51-2.)

The issue in this case is whether managers at levels lower than corporate officers may be "employers" under FLSA.  Plaintiffs cite cases which show the opposite: corporate officers without day-to-day authority may still be considered FLSA employers.  *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (founder, sole boardmember, and operational decisionmaker of partnership was liable as employer; his partners held joint and several liability because of Michigan partnership law); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991) (president and "top man" of corporation is FLSA employer, even though managers handled day-to-day issues and hours worked); *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 530 (5th Cir. 1982) (finding owner of three companies to be "employer" of each); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir. 1999) (founder and 50% owner of company, who hired managerial staff, "occasionally" controlled work schedules and conditions of employment, and had some involvement in employees' method of pay, found to be an employer); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) (owner and founder who guided policy and held purse strings of corporations found to be "employer"); *Shultz v. Mack Farland & Sons Roofing Co.*, 413 F.2d 1296, 1299 (5th Cir. 1969) (founder, owner, major

stockholder, president, and director McFarland was "employer" under FLSA, despite his placement of corporations under the management of supervisors).

Courts that assess the roles of non-corporate officers and non-owners do not reach the same conclusions. In fact, "often absent an ownership interest or a role as an officer or director of a covered employer, individual restaurant managers will not be considered 'employers' for purposes of FLSA." *Wise v. T-Man, LLC*, No, 1:14-cv-630, 2016 WL 3544715, at *7–8 (N.D. Ohio June 29, 2016). Despite argument to the effect that DelVecchio "owns" Store #621, there is simply no evidence that he retains any ownership interest. By contrast, the job description for General Manager—affirmed by Darren DelVecchio—states that the position is "Salaried Exempt." (Doc. 151-2, at PAGEID 7776.) There is also no evidence that Myers retains any ownership interest in Abuelo's.

On this record, DelVecchio and Myers are not "employers" under FLSA. Turning to the factors, Plaintiffs are not "integral part[s] of the operations" of *DelVecchio or Myers*—they are integral parts of the operations of *Abuelo's*. Plaintiffs' economic dependence is on *Abuelo's*, not on DelVecchio or Myers. In other words, no money comes out of the pockets of DelVecchio or Myers to pay Plaintiffs. The terms and conditions of Plaintiffs' work are laid out in the employee handbook, which is not alterable by DelVecchio or Myers. *Clark*, 77 F. Supp. 3d at 690. DelVecchio, but not Myers, has the authority to hire or fire Plaintiffs. Finally, neither DelVecchio nor Myers establishes the rate and method of paying Plaintiffs, though they may maintain Plaintiffs' employment records.

Because the Court finds that DelVecchio and Myers are not employers under FLSA, it **GRANTS** Defendants' motions for summary judgment on Plaintiffs' FLSA claims as they relate to Defendants DelVecchio and Myers.

## C.  Johnson's Hostile Work Environment Claim

This Court adopted Magistrate Judge Abel's recommendation that Plaintiff Johnson's

Hostile Work Environment claim proceed.  (Johnson Doc. 37.)  In so recommending, Magistrate

Judge Abel noted the following:

> The complaint alleges that on Black Friday 2010, Del Vecchio rebuked Johnson for offering Teddy Crozier tables outside of the non-Caucasian area. Johnson viewed Del Vecchio's discrimination and segregation as offensive and reported the incident to Linihan. *Id.*, ¶ 54. However, the claim does not allege what retaliatory or other actionable conduct defendant Myers engaged in or when that conduct occurred. Consequently, the tendered amended complaint fails to give defendant Myers fair notice of the claim pleaded against him. Although I recognize that the tendered amended complaint may not survive a motion to dismiss because it does not allege any adverse job action other than a "rebuke" on one occasion, I conclude that argument should not be resolved in a decision whether to grant leave to file an amended complaint. Accordingly, the leave to amend is granted as to this claim against defendants Del Vecchio, Food Concepts International, LP, and Abuelo's International LP.

(Johnson Doc. 35 at 48.)  Although Plaintiff Johnson moved to amend her complaint, (Johnson

Doc. 77), she never sought to bolster her hostile work environment claim.  Instead, she sought to

assert and plead additional claims under FLSA, Article II, § 34(a) of the Ohio Constitution, and

the Ohio Minimum Fair Wage Standards Act.  O.R.C. § 4111, *et seq.*  (*See* Johnson Doc. 77 at

1.)

Furthermore, Johnson did not oppose Defendants' motion for summary judgment on her

hostile work environment claim, which caused her to abandon that claim.  *Clark*, 178 F. App'x at

524-25; *Dage*, 395 F. Supp. 2d at 679; Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact

cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of

materials in the record . . . or showing that the materials cited do not establish the absence or

presence of a genuine dispute.").

The Court **GRANTS** Defendants' motion for summary judgment on Johnson's hostile

work environment claim.

## IV. CONCLUSION

For the reasons stated above, the Court:

- **DENIES** Plaintiffs' motion to strike Defendants' Reply in Support of their Motion to Strike Plaintiffs' Affidavits; (Miller Doc. 181);

- **GRANTS** in part Defendants' Motion to Strike Affidavits Filed with Plaintiffs' Memoranda in Opposition to Defendants' Motions for Summary Judgment, as follows:

  - **GRANTS** Defendants' motion to strike the affidavits of Plaintiffs Miller, Crozier, Coleman, Troyer, Tigner, and Keegan;

  - **GRANTS** Defendants' motion to strike parts of the affidavits of McEldowney, Linihan, and Lucanin; and

  - **DENIES** Defendants' motion to strike the affidavits of Plaintiffs Gibbs and Johnson (Miller Doc. 178); and

- **GRANTS in part** and **DENIES in part** Defendants' motions for summary judgment,[19] as follows:

---

[19] Defendants' Motions for Summary Judgment may be found at the following case and docket numbers:

| Case Number | Docket Number |
| --- | --- |
| Miller, 2:13-cv-00124 | 156 |
| Crozier, 2:13-cv-00125 | 75 |
| Coleman, 2:13-cv-00126 | 73 |
| Gibbs, 2:13-cv-00127 | 77 |
| Johnson, 2:13-cv-00129 | 92 |
| Troyer, 2:13-cv-00130 | 77 |
| Tigner, 2:13-cv-00132 | 77 |
| McEldowney, 2:13-cv-00133 | 75 |
| Keegan, 2:13-cv-00134 | 77 |

- o  **GRANTS** Defendants' motions for summary judgment as to Plaintiffs' breach of contract claims;

- o  **DENIES** Defendants' motions for summary judgment as to Plaintiffs' wage and hour FLSA claims against Defendants Abuelo's and Food Concepts;

- o  **GRANTS** Defendants' motions for summary judgment as to Plaintiffs' wage and hour FLSA claims against Defendants DelVecchio and Myers, who are consequently **DISMISSED** from Plaintiffs' cases;

- o  **GRANTS** Defendants' motions for summary judgment as to Plaintiffs' unalleged FLSA tip share claims; and

- o  **GRANTS** Defendants' motions for summary judgment as to Plaintiff Johnson's hostile work environment claim.


**IT IS SO ORDERED.**


 _/s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED:  March 29, 2017**